JONAH P. BROWN
JOHN SITHER
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
150 M Street, NE
Washington, D.C. 20044-7611
Jonah.Brown@usdoj.gov
John.Sither@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA <br><br> Plaintiff, <br><br> v. <br><br> R.D.M. MULTI-ENTERPRISES, INC. <br><br> and <br><br> The DIFRANCESCO TRUST, <br><br> Defendants. | Civ. No. CV-26-56-BU-TJC |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, and acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

1

## NATURE OF ACTION AND OVERVIEW

1.     This is a civil action brought by the United States against Defendants R.D.M. Multi-Enterprises, Inc. ("RDM"), and the DiFrancesco Trust ("Trust") (collectively, "Defendants") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675.  The United States brings this action under CERCLA Section 104(e), 42 U.S.C. § 9604(e), seeking a court order granting EPA, and its representative under 40 C.F.R. § 300.400(d)(3), Atlantic Richfield Company ("Atlantic Richfield") and its contractors, access to certain real property parcels owned by Defendants and located within the Anaconda Smelter Superfund Site ("Site"). Defendants' properties, described in greater detail herein, are referred to as the Anaconda Landfill Slag and the Arbiter Parcels (collectively, the "Properties").

2.     To date, Defendants have refused to grant Atlantic Richfield and EPA access to the Properties for the purpose of taking certain CERCLA response actions required of Atlantic Richfield under a final consent decree for the Site entered by this Court in *United States and State of Montana v. Atlantic Richfield Co.*, Civ. No. 89-039, on December 16, 2022 ("2022 Consent Decree").

3.     Atlantic Richfield and EPA have unsuccessfully obtained access to the Properties despite repeated requests for access by consent.

4.     As set forth in greater detail below, the United States seeks an Order

in Aid of Immediate Access to the Properties under CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), to develop a remedial design work plan for slag pile grading and closure of the Anaconda Landfill Slag, perform remedial action at the Arbiter Parcels, and carry out other necessary CERCLA response activities at the Properties.

## JURISDICTION AND VENUE

5.     This court possesses jurisdiction over the subject matter of this action and personal jurisdiction over Defendants under CERCLA, 42 U.S.C. § 9613(b) and 28 U.S.C. §§ 1331 and 1345.

6.     Venue is proper in this judicial district under 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release or threatened release of hazardous substances that give rise to this claim occurred and are occurring on Defendants' Properties located within this district.

## DEFENDANTS

7.     Defendant RDM is a domestic for-profit corporation registered in the state of Montana in active and good standing.

8.     Defendant RDM's principal address is located at 105 N. Silver Street, Anaconda, Montana, 59711.

9.     Evelyn DiFrancesco is the President or Chief Executive Officer of RDM.  Ron DiFrancesco is an Officer and the Registered Agent of RDM.  Edie

Rosenbloom is an Officer of RDM.

10.     Edie Rosenbloom is the Vice President of the Trust.

11.     Defendant Trust is or has in the past been affiliated with RDM Multi-Enterprises, Inc.

## STATUTORY BACKGROUND

12.     Whenever there is a release or substantial threat of release of a hazardous substance into the environment, EPA "is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . or take any other response measure consistent with the national contingency plan" that EPA deems necessary to protect the public health or welfare or the environment.  42 U.S.C. § 9604(a)(1).

13.     CERCLA Section 104(e), 42 U.S.C. § 9604(e), grants officers, employees, or duly designated representatives of EPA authority for information gathering and access.  Where there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant, CERCLA authorizes EPA "to enter at reasonable times" any vessel, facility, establishment, or other place or property that falls into one or more of the following categories: (A) "where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed or transported

from;" (B) "from which or to which a hazardous substance or pollutant or contaminant has been or may have been released;" (C) "where such release is or may be threatened;" and (D) "where entry is needed to determine the need for a response or the appropriate response or to effectuate a response action under this subchapter." 42 U.S.C. §§ 9604(e)(1), 9604(e)(3).

14.    EPA may exercise this authority to enter "for the purposes of determining the need for response, choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter."  42 U.S.C. § 9604(e)(1).

15.    CERCLA Section 104(e) authorizes the United States to commence a civil action to either compel compliance with a request for access or to compel compliance with an administrative order for access. 42 U.S.C. § 9604(e)(5)(B). The statute provides that, where there is reasonable basis to believe there may be a release or threat of a release of a hazardous substance, pollutant, or contaminant, the court "shall enjoin" interference with an EPA request or order for entry "unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 9604(e)(5)(B)(i).

16.    CERCLA, 42 U.S.C. § 9604(e)(6), provides that nothing in CERCLA Section 104(e) shall preclude EPA from securing access in any other lawful

manner.

## GENERAL ALLEGATIONS

**Site Background and Operable Units**

17.     The Site constitutes one of several Superfund sites in the Upper Clark Fork River Basin.

18.     The Site covers approximately 209 square miles in and around the town of Anaconda, Montana where the Anaconda Copper Mining Company or its successors conducted milling and smelting operations beginning in the late 1800s.

19.     Smelting operations concluded in 1980, followed by the dismantling of most facilities at the Site.  The operations resulted in large volumes of wastes, slag, tailings, flue dust, and debris, that contaminated soils, groundwater, and surface water with high concentrations of hazardous substances including arsenic, lead, copper, cadmium, and zinc.

20.     EPA placed the Site on the National Priorities List on September 8, 1983, under section 105 of CERCLA, 42 U.S.C. § 9605. *See* 48 Fed. Reg. 40658.

21.     The Site is organized into Operable Units.  Remedial action is actively occurring at three Operable Units, which are each shown on the map below as the CSOU (the Community Soils Operable Unit), the ARWW&S OU (the Anaconda Regional Waste, Water & Soils Operable Unit), and the OW/EADA OU (the Old Work/East Anaconda Development Area Operable Unit).



Document Path: C:\Users\lovere\OneDrive - CDM Smith\Anaconda\New folder\Anaconda Boundary.mxd

**Legend:**
- CSOU Boundary
- ARWW&S OU Boundary
- OW/EADA OU Boundary
- CSOU Residential Areas

Scale of Miles
0  0.5  1   2   3   4

**Anaconda Smelter Operable Units**
Anaconda Regional Water, Waste, & Soils OU
Anaconda Smelter NPL Site, Montana

22.    Significant cleanup progress has occurred at the Site under EPA administrative orders dating back to 1984 that required Atlantic Richfield to conduct various remedial actions.

23.    As a result of these cleanup activities, in 2020 and 2023, EPA announced partial deletions of several Site Operable Units from the National Priorities List.  EPA announces deletions of portions of a CERCLA Site when required remedial actions have been implemented and conditions no longer pose an unacceptable risk to human health or the environment.

24.    The 2022 Consent Decree requires Atlantic Richfield to finish the remaining response actions at the three active Operable Units, including certain actions to remediate the Properties. The Properties are shown on the map, below.



Anaconda Landfill Slag

Arbiter Parcels

Parcel Ownership
- DiFrancisco Trust
- Anaconda – Deer Lodge County

N
0    200    400 US Feet
Scale 1:5,000

**Anaconda Landfill Slag and Arbiter Parcels**
Anaconda Smelter NPL Site
Anaconda, Montana

25.     Remedial action in the Anaconda Regional Water, Waste, & Soils Operable Unit, which includes the Anaconda Landfill Slag, is substantially complete.  Over 20,000 acres in the Operable Unit have been remediated.

26.     Construction of the remedy in the Old Works/East Anaconda Development Area Operable Unit is complete in five of the six subareas. Construction is substantially complete in the final subarea, except for four private properties where access has not been granted: the Arbiter Parcels and property held by one other owner.

27.     Remaining work in the final active Operable Unit, the Community Soils Operable Unit, includes sampling and cleanup of arsenic and lead in residential yards.

**The Anaconda Landfill Slag**

28.     The 1998 Anaconda Regional Water, Waste, & Soils Operable Unit Record of Decision ("ROD") provides a framework for, among other activities, remediation of the following three slag piles:  The Anaconda Landfill Slag, the Main Granulated Slag, and the West Stack Slag.

29.     The Anaconda Landfill Slag consists of a 16-acre site located approximately one mile east of the town of Anaconda in Deer Lodge County, Montana (the "County").

30.     The southern portion of the slag pile is located on approximately 11

acres of County-owned land, on which RDM possesses an easement.

31.    The County has been a partner to EPA in Site remediation.  The County will make access to its property available to EPA and Atlantic Richfield where the southern portion of the slag occurs to remediate the slag.

32.    The remainder of the land covered by the slag pile is a five-acre parcel in the southwest quarter of Section 31, Township 5 north, Range 10 west that is owned by the Trust.

33.    The estimated volume of the Anaconda Landfill Slag is 129,000 cubic yards.

34.    The slag itself was acquired by RDM under a 1998 agreement with the County.

35.    EPA has reviewed available information relevant to the Anaconda Landfill Slag and determined on July 11, 2024, in consultation with the Montana Department of Environmental Quality (MDEQ), that conditions at the Anaconda Landfill Slag present an unacceptable risk to human health and/or the environment.

36.    An EPA toxicologist reached this risk determination based on the following factors:

    a. Arsenic in slag material at the Main Granulated Slag, which appears to be the same or similar granulated slag as that of the Anaconda Landfill Slag, possesses arsenic with significantly more bioavailability

than previously assumed;

b. Trespassers regularly ride bicycles and other recreational vehicles across the slag pile, generating harmful dust that trespassers might inhale; and

c. Transport of the slag through wind and water erosion onto adjacent properties could result in arsenic and lead concentrations above applicable CERCLA cleanup standards.

37. EPA has therefore concluded that exposure to the slag could result in the exposure of people to lead and arsenic. Arsenic has been linked to skin, liver, bladder, and lung cancer, and the U.S. Department of Health and Human Services has designated it as a known human carcinogen. Lead can adversely affect the nervous system, kidney function, immune system, reproductive system, development, and cardiovascular system. Lead can also cause neurological effects in children and can be passed from a mother's body to negatively affect the health of an unborn child.

38. The Anaconda Landfill Slag lacks fencing or other barriers. Only vehicular access is restricted by a gate on County-owned property. Access by foot, bike, and motorbike is not restricted. Although access is discouraged by "no trespassing" signage, signs of trespassing abound on the property, including tire tracks from motorcycle and/or dirt bike riders.

**The Anaconda Landfill Slag Final Operation and Closure/Reclamation Plan**

39.     The Anaconda Regional Water, Waste & Soils ROD deferred final closure of the waste piles, including the Anaconda Landfill Slag, to allow them to be developed as a resource consistent with remedial action objectives.

40.     At the time EPA issued the Anaconda Regional Water, Waste & Soils ROD in 1998, RDM was engaged in processing slag to produce iron silicate for roofing granules and abrasives at the Main Granulated Slag under contract with Atlantic Richfield.

41.     On September 29, 2003, EPA issued a Unilateral Administrative Order for Remedial Action ("2003 Order") to both Atlantic Richfield and RDM, for the Slag Remedial Design Unit of the Anaconda Regional Water, Waste & Soils Operable Unit.  The 2003 Order required implementation of remedial action at three slag piles within the Anaconda Regional Water, Waste and Soils Operable Unit, including the Anaconda Landfill Slag.

42.     The 2003 Order directed RDM and Atlantic Richfield to act in accordance with requirements set forth in the 2003 Anaconda Slag Final Operation and Closure/Reclamation Plan ("Anaconda Landfill Slag Closure Plan").

43.     The Anaconda Landfill Slag Closure Plan established the steps required to manage and eventually close the Anaconda Landfill Slag.

44.     The Anaconda Landfill Slag Closure Plan required that slag operators submit an operations plan, demonstrate a viable commercial use of the slag, and obtain applicable permits from MDEQ.

45.     The Anaconda Landfill Slag Closure Plan further required that a final grading plan for the Anaconda Landfill Slag must be provided to EPA and the Montana Department of Environmental Quality upon "permanent cessation of operations."

46.     The 2003 Order required RDM and Atlantic Richfield to provide written notice to EPA stating whether they will comply with the Order.  EPA has no record of having received from RDM a notice of intent to comply with the 2003 Order or its implementing plans.

**The 2022 Slag Management Plan Closure Provisions**

47.     The 2022 Consent Decree provided that "[a]s of the Effective Date, [Atlantic Richfield's] obligations under the [2003 Order] shall be terminated and be replaced and superseded by the requirements of this Consent Decree."  2022 Consent Decree, ¶ 100.  The 2022 Consent Decree did not alter RDM's obligations under the 2003 Order.

48.     The 2022 Consent Decree effectuated several enforceable plans, including an Anaconda Landfill Slag Management Plan ("2022 Slag Management Plan") that provides a preliminary closure plan for the slag.

14

49.     Like the Anaconda Landfill Slag Closure Plan, the 2022 Slag Management Plan requires development of a final work plan for closure of the slag pile upon "permanent suspension" of slag processing and resale operations. Permanent suspension occurs when slag material is not processed or transported from the site for a period of five years or if the slag resource is depleted.

50.     Under the 2022 Slag Management Plan, Atlantic Richfield is required to provide EPA with a Remedial Design Work Plan for final closure of the Anaconda Landfill Slag by the earlier of:

a.      90 days after permanent suspension of slag processing operations;

b.      The end of 2024 if no slag processing is initiated; or

c.      A finding by EPA that operations or conditions present an unacceptable risk to human health or the environment.

51.     Upon information and belief, neither RDM nor any permitted operator has processed or transported slag from the Anaconda Landfill Slag in more than five years, and therefore permanent suspension of slag processing operations has occurred.

52.     Upon information and belief, no slag processing has been initiated by the end of 2024.

53.     Further, EPA determined on July 11, 2024, in consultation with the Montana Department of Environmental Quality, that the conditions at the

Anaconda Landfill Slag present an unacceptable risk to human health and/or the environment.

54.     A Remedial Design Work Plan for the Anaconda Landfill Slag is therefore due to the EPA under the 2022 Slag Management Plan.  A Final Remedial Action Work Plan must follow the Remedial Design Work Plan and must be presented at the time of final closure.

55.     Atlantic Richfield must first obtain access to the Anaconda Landfill Slag to gather information needed to develop plans for submission to EPA. Atlantic Richfield also requires access to implement final closure of the slag pile.

56.     The 2022 Consent Decree requires Atlantic Richfield to use "best efforts" to secure access to the slag to conduct any activity related to the 2022 Consent Decree.  The 2022 Consent Decree further provides that the United States may assist Atlantic Richfield in obtaining access as it deems appropriate.

57.     RDM has not granted Atlantic Richfield access to the Anaconda Landfill Slag despite requests from both Atlantic Richfield and EPA and the U.S. Department of Justice.  Without access, Atlantic Richfield is unable to conduct the remaining cleanup activities required under the 2022 Consent Decree for this part of the Site.

**The Arbiter Industrial Complex and the Arbiter Parcels**

58.     The Arbiter Industrial Complex is within an operable unit known as

the Old Works/East Anaconda Development Area Operable Unit.

59. The Arbiter Industrial Complex consists of approximately 40 acres overlying historic waste materials and contaminated soils.

60. The Trust owns Lots 1A, 2, and 3B of the Arbiter Industrial Complex (the "Arbiter Parcels").  The Arbiter Parcels constitute 12 acres just south of the Anaconda Landfill Slag site.

61. A 1994 ROD for the Old Works/East Anaconda Development Area Operable Unit establishes that the principal contaminant of concern is arsenic from past aerial emissions.  The 1994 ROD selected a remedy that would implement controls to prevent human contact with waste materials and reduce arsenic and metals concentrations in soil, groundwater, and surface water.

62. Soil investigations at the Arbiter Industrial Complex outside of the Arbiter Parcels documented arsenic concentrations in surface soil (0 to 2 inches) ranging from 160 parts per million (ppm) to 2,260 ppm.

63. The 2022 Consent Decree requires performance of remedial action at the Arbiter Industrial Complex in accordance with an Individual Site Work Plan for specific properties that require remedial work, including the Arbiter Parcels.

64. Access to the Arbiter Parcels is necessary to perform activities under the Individual Site Work Plan, including inspections, grading, installation of storm water controls, removal of certain existing structures and materials, and the

17

placement of an industrial engineered cover.

65.    The Trust has not granted Atlantic Richfield or EPA access to the Arbiter Parcels despite requests from EPA and the U.S. Department of Justice. Without such access, Atlantic Richfield is unable to conduct the remaining cleanup activities required under the 2022 Consent Decree for this part of the Site.

**Attempts to Obtain Access to the Arbiter Parcels and the Anaconda Landfill Slag**

66.    EPA mailed the 2003 Order to RDM in October 2003 which set forth the required remedial action at three slag piles including the Anaconda Landfill Slag.  While remediation of the slag would not begin until after the slag had been reprocessed, the Order included conditions for reprocessing slag relevant to RDM.

67.    As set forth above, EPA has not identified any record that RDM provided its notice of intent to comply with the 2003 Order.

**Access Efforts 2010 - 2015**

68.    Atlantic Richfield developed plans to perform work at the Arbiter Parcels in August 2010.  According to an email exchange dated October 14, 2010, EPA delivered a work plan for remedial action at the Arbiter Industrial Complex and an access agreement to Trust representative Ron DiFrancesco.  Mr. DiFrancesco communicated that he had "issues" with the plan to discuss with EPA.

69.    A July 2012 EPA email exchange shows that Mr. DiFrancesco and an EPA contractor intended to meet and review the design concept for the Arbiter

Parcels remedial action, and a draft Individual Site Work Plan for the Arbiter Parcels could be provided.

70.     On August 10, 2012, Atlantic Richfield submitted a draft Individual Site Work Plan for the Arbiter Parcels to EPA and MDEQ.  The Individual Site Work Plan described the remedial action construction activities that Atlantic Richfield proposed to implement at the Arbiter Parcels.  Atlantic Richfield also provided landowner access agreements for the Arbiter Parcels.

71.     On or about August 17, 2012, EPA provided copies of the Individual Site Work Plan and access agreements for the Arbiter Parcels to Trust representative Evelyn DiFrancesco.  EPA's transmittal letter requested Ms. DiFrancesco expedite her review and execution of the access agreements.  EPA also offered to resolve any issues relating to the proposed designs or the access agreements in a timely manner.

72.     Ms. DiFrancesco confirmed receipt of the access agreements via fax on August 24, 2012.

73.     On August 6, 2013, EPA provided a letter to Trust representatives Evelyn DiFrancesco and Edie Rosenbloom, confirming a meeting to discuss the Individual Site Work Plan.

74.     EPA scheduled the meeting for August 26, 2013, with Trust representatives Evelyn DiFrancesco and Edie Rosenbloom to discuss the

Individual Site Work Plan and access agreements for the Arbiter Parcels.  An

Atlantic Richfield progress report submitted in September 2013 confirms that the

EPA, MDEQ, Atlantic Richfield and the DiFrancescos attended this meeting.

75.    Neither Ms. DiFrancesco nor another representative of the Trust

signed and returned the access agreements following the August 26, 2013,

meeting.

76.    On February 27, 2015, EPA provided revised copies of the Individual

Site Work Plan to Ms. DiFrancesco and Ms. Rosenbloom for review.  EPA's

transmittal letter stated "[u]pon your approval, Atlantic Richfield will proceed with

the development of an access agreement with you to conduct the work."  EPA

further stated that receiving Ms. DiFrancesco's and Ms. Rosenbloom's approval by

April 30, 2015, would help ensure that remedial activities could commence in

2015.

77.    EPA has identified no records to show that any representative of the

Trust provided consent for access to the Arbiter Parcels following EPA's February

27, 2015, letter.

**Access Efforts under the 2022 Consent Decree**

78.    On May 19, 2023, following entry of the 2022 Consent Decree,

Atlantic Richfield wrote to RDM, the Trust, and Ron DiFrancesco, using addresses

in the public record.  Atlantic Richfield sought to confirm if slag processing

operations had been permanently suspended, or if RDM or the Trust intended to begin or resume slag processing operations in the near future, consistent with the 2022 Slag Management Plan.  Atlantic Richfield also provided a written request for access to the Anaconda Landfill Slag to perform pre-design assessment work.  Atlantic Richfield requested that RDM and the Trust respond to the access request, and return signed access agreements, within 30 days of receipt.

79.    Atlantic Richfield reported that one of the three letters was successfully delivered to the Trust, but the letters addressed to RDM and to Ron DiFrancesco failed to be delivered.  On May 24 and 26, 2023, Atlantic Richfield re-sent the letter to an additional address found for RDM and re-sent the letter to Ron DiFrancesco without requiring a signature.  Both letters were successfully delivered, but Atlantic Richfield did not receive any response.

80.    On December 11, 2023, Atlantic Richfield requested the United States's assistance in obtaining access to the Anaconda Landfill Slag in accordance with Paragraphs 21 and 22 of the 2022 Consent Decree.

81.    On March 27, 2024, Atlantic Richfield submitted a second letter to the United States in accordance with Paragraphs 21 and 22 of the 2022 Consent Decree, requesting assistance in obtaining access from the DiFrancesco Trust to the Arbiter Parcels.

82.    On August 20, 2024, EPA submitted a written request for consent for

access to the Anaconda Landfill Slag and the Arbiter Parcels from RDM and the Trust.  EPA addressed the letters to Ron DiFrancesco as RDM's Registered Agent; Evelyn DiFrancesco as President of RDM and Trustee of the Trust; and Edie Rosenbloom as Officer of RDM.

83.    EPA requested that RDM and the DiFrancesco Trust respond to the request for access within 30 days of receipt.

84.    EPA also sought any documentation demonstrating that slag processing has occurred at the Anaconda Landfill Slag over the past five years, consistent with the 2022 Slag Management Plan.

85.    EPA received proof of delivery from one of the five addresses.

86.    EPA did not receive a response from Mr. Ron DiFrancesco or any other representative of Defendants within 30 days, or at any point thereafter.

87.    On May 27, 2025, Trust Representative Edie Rosenbloom sent an email to EPA Remedial Project Manager, Bryan Lobar requesting a meeting with EPA on June 10, 2025. Mr. Lobar replied on June 2, 2025, and sent a virtual meeting invitation for Ms. Rosenbloom's requested date. Mr. Lobar received a notification from Ms. Rosenbloom on June 8, 2025, that she had declined the June 10, 2025, meeting invitation.

88.    Mr. Lobar replied to Ms. Rosenbloom's declination on June 9, 2025, and asked for availability to reschedule the meeting. Ms. Rosenbloom did not

respond.

89.    Mr. Lobar again sent emails to Ms. Rosenbloom and Mr. DiFrancesco on June 13, 2025, and June 14, 2025, to ask for availability to reschedule the meeting.

90.    Mr. Lobar received an email from Ms. Rosenbloom on July 30, 2025, requesting a meeting between August 11-15, 2025, to "go over the work plan." The email included nine numbered topics of discussion. Mr. Lobar responded on August 25, 2025, offering to host the meeting in EPA's Helena office, hold virtual meetings, or meet on other dates. Mr. Lobar received no response.

91.    Mr. Lobar and Ms. Rosenbloom connected over the phone on September 9, 2025, and agreed to schedule a meeting at the EPA office in Helena on September 12, 2025, which Ms. Rosenbloom subsequently agreed to reschedule at EPA's request for September 16, 2025. Ms. Rosenbloom accepted a calendar invitation for the meeting.

92.    On September 16, 2025, Mr. Lobar prepared a meeting room in the EPA's Helena office to host Ms. Rosenbloom and Mr. DiFrancesco. Also in attendance were EPA Remedial Project Managers, Layla Landeros and Allie Archer, and EPA oversight contractor for the Site, Ben Simpson.  Three Atlantic Richfield representatives were also present.

93.    Neither Ms. Rosenbloom nor Mr. DiFrancesco appeared at the

September 16, 2025, meeting.

94.     Approximately five minutes after the scheduled meeting time, Mr. Lobar called Ms. Rosenbloom to confirm whether she had reached the Helena office. Ms. Rosenbloom provided several reasons for why she was not present, including that (1) Mr. DiFrancesco had just returned from a fishing trip and wanted to "review the books" before meeting; (2) Mr. DiFrancesco's vehicle transmission had issues and needed repair; (3) morning meetings do not work for Ms. Rosenbloom because she attends daily mass; and (4) Mr. DiFrancesco thought that the meeting was in the afternoon. Ms. Rosenbloom asked if they could meet another time. Ms. Rosenbloom stated that she would go to Mr. DiFrancesco's house and call back to provide availability to reschedule the meeting. She did not call back or otherwise join the meeting virtually.

95.     Ms. Rosenbloom emailed Mr. Lobar on October 16, 2025, stating that, "[m]y family had reservations at the previous time we were to meet I have worked out most of these concerns with them since I have full control of this situation." The email further stated that Ms. Rosenbloom was "going to be in Montana on January 15th" and stated "I hope to hear from you by the time I get back to Montana on January 15th 2025." Ms. Rosenbloom also sent a second email on October 26, clarifying that she meant "January 15, 2026."

96.     EPA Remedial Project Manager, Layla Landeros, assumed

responsibilities for the Site and communication with RDM in October, 2025.

97.    On October 29, 2025, Ms. Landeros replied to Ms. Rosenbloom's October 16, 2025, email introducing herself and sharing that future communications should be directed exclusively to Ms. Landeros. Ms. Landeros asked Ms. Rosenbloom for availability to meet in November 2025. Ms. Landeros also expressed willingness to meet in January, 2026.

98.    Ms. Landeros received no response to her October 29, 2025, email. Ms. Landeros sent a follow-up email to Ms. Rosenbloom on November 4, 2025 to which she also received no response.

99.    Ms. Rosenbloom sent an email to Mr. Lobar on November 17, 2025, which stated: "I can be available to meet with you at your convenience from January 18th 2026."

100.    Mr. Lobar forwarded the email to Ms. Landeros who replied on November 18, 2025, again offering to meet earlier, and to hold a second meeting in Montana in January, 2026. Ms. Landeros received no response.

101.    Ms. Landeros attempted a phone call to Ms. Rosenbloom on December 2, 2025. Reaching Ms. Rosenbloom's voicemail, Ms. Landeros left a message offering again to meet in January. Ms. Landeros received no response.

102.    Ms. Landeros again attempted a phone call to Ms. Rosenbloom on December 9, 2025. Ms. Landeros was unable to leave a message because Ms.

Rosenbloom's voicemail box was full.

103.   On January 20, 2026, EPA sent a letter to Ms. Rosenbloom and Mr. DiFrancesco by email, and mailed the letter to each of them on the next day.  The letter contained EPA's final request for access to the Properties.

104.   On May 21 and again on May 27, 2026 the United States Department of Justice sent a final letter requesting access to the Anaconda Landfill Slag and the Arbiter Parcels, but did not receive a response.

### Basis for Relief Under CERCLA Section 104(e)

105.   EPA, and its designated representative, Atlantic Richfield, seek access to the Properties.  The Properties each constitute a "facility, establishment, or other place or property" within the meaning of CERCLA Section 104(e)(3); 42 U.S.C. §9604(e)(3).

106.   EPA has identified that the Properties contain, or may contain, lead and arsenic in concentrations that exceed remedial action levels.  Lead and arsenic constitute hazardous substances under CERCLA Section 101(14), 42 U.S.C. § 9601(14).  EPA has a "reasonable basis to believe there may be a release or threat of release of a hazardous substance" from the Properties within the meaning of CERCLA Section 104(e)(1) and (e)(5)(B), 42 U.S.C. § 9604(e)(1), (e)(5)(B).

107.   EPA, and its designated representative, Atlantic Richfield, seek access to the Properties to "determine the need for a response or the appropriate response

or to effectuate a response action[,]" within the meaning of CERCLA Section 104(e)(3)(D), 42 U.S.C. § 9604(e)(3)(D).

108.   EPA has repeatedly sought Defendants' consent for access to the Properties to conduct the response action.  Defendants have not granted consent to access the Properties to EPA, and its representative under 40 C.F.R. § 300.400(d)(3), Atlantic Richfield, and therefore an order is justified under CERCLA Section 104(e)(5)(A), 42 U.S.C. § 9604(e)(5)(A).

109.   EPA seeks access to implement remedial action mandated under a 2022 Consent Decree.  EPA seeks access for specific amounts of time to carry out the remedial activities.  EPA's request for access is therefore not "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 9604(e)(5)(B)(i).

## CLAIM FOR RELIEF

110.   The preceding paragraphs are incorporated herein by reference.

111.   EPA seeks an Order in Aid of Immediate Access granting EPA and its representative under 40 C.F.R. § 300.400(d)(3), Atlantic Richfield, access to the Properties.

112.   In accordance with CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), the Court should enter an Order in Aid of Immediate Access compelling compliance with EPA's request and order that EPA and Atlantic

Richfield, shall be allowed to enter the Properties at reasonable times for the purpose of performing any and all CERCLA response activities, including but not limited to, development of a remedial design work plan for slag pile grading, and closure of the Anaconda Landfill Slag, and performance of remedial action at the Arbiter Parcels.

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America respectfully requests that this Court:

1.      Issue an Order granting EPA and its employees, and its representatives under 40 C.F.R. § 300.400(d)(3), Atlantic Richfield and its contractors, any and all access to, through, over, and under Defendants' Properties for the duration of time necessary for EPA to oversee and for Atlantic Richfield to perform any and all CERCLA response activities, including but not limited to development of a remedial design work plan for slag pile grading and closure of the Anaconda Landfill Slag, performance of remedial action at the Arbiter Parcels, operation and maintenance, five year reviews, and carrying out other necessary CERCLA response activities at the Properties.

2.      Issue an Order against Defendants enjoining any interference with the access provided above; and

3.      Grant such other relief as this Court deems appropriate.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ John Sither*
JONAH P. BROWN
JOHN SITHER
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
150 M Street, NE
Washington, D.C. 20044-7611
(202) 532-3264
Jonah.Brown@usdoj.gov
John.Sither@usdoj.gov

29